**NO. 21-1330**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

Subhadra Gunawardana and David Seely
*Plaintiffs-Appellants*
v.

American Veterinary Medical Association (AVMA), Educational Commission for Foreign
Veterinary Graduates (ECFVG) and Council on Education (COE)
*Defendants-Appellees*

---

On Appeal from the United States District Court for the
Southern District of Illinois, Case No. 3:19-cv-00096-NJR
The Honorable Judge Nancy J. Rosenstengel

**PLAINTIFFS-APPELLANTS' SEPARATE APPENDIX**

Subhadra Gunawardana
David Seely
4308 Marion Garden Ln
Florissant, MO 63034
314-764-1520; 615-423-8851
subhadra.gunawardana@wustl.edu
david-seely@live.com

# SEPARATE APPENDIX

***Contents***

Proposed Second Amended Complaint…………………............................................S.A. i

Email submitting the proposed Second Amended Complaint to
Court…..........................................................................................................................S.A. ii

# SECOND AMENDED COMPLAINT

Contents

**PARTIES, JURISDICTION AND SERVICE** ........................................................................ 1

**STATEMENT OF CLAIM** ................................................................ 2

**FACTS AND BACKGROUND** .......................................................... 3

    ECFVG policies & Procedures ................................................................ 9

        *a. Appeals procedure [Exhibit 3, pages 15-19]:* .......................................... 9

        *b. English Language Requirement [Exhibit 3, page 10]* ................................ 12

        *c. CPE Candidate Bulletin [Exhibit 4]* ...................................................... 13

    Comparison of Medical and Veterinary Fields ............................................ 15

**CLAIMS FOR SUBHADRA GUNAWARDANA** ............................................ 19

    Count I: Contract Claims ........................................................................ 19

    Count II: Violation of Title VII of the Civil Rights Act ................................ 24

    Count III: Violation of 42 U.S.C. § 1981 .................................................. 27

    Count IV: Violations of the 14th Amendment of the Constitution ................. 28

    Count V: Violations of the Sherman Antitrust Act ...................................... 34

    Count VI: Violation of 42 U.S.C. § 1985(3) ............................................. 39

    Count VII: Violations of the Americans with Disabilities Act ...................... 41

**CLAIMS FOR DAVID SEELY** ............................................................. 43

    Count VIII: Violation of the ADA ............................................................ 43

**CLAIMS FOR BOTH PLINTIFFS**

    Count IX: Violations of the Sherman Antitrust Act ..................................... 44

**RELIEF** .......................................................................................... 46

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Subhadra Gunawardana and David Seely | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 3:19-cv-00096-NJR |
| | ) |
| American Veterinary Medical Association | ) |
| (AVMA), Educational Commission for Foreign | ) |
| Veterinary Graduates (ECFVG) and Council on | ) |
| Education (COE) | ) |
| | ) |
| | ) |
| Defendants. | ) |

## SECOND AMENDED COMPLAINT

## PARTIES, JURISDICTION AND SERVICE

1.   The Plaintiffs are Subhadra Gunawardana [hereafter "Dr. Gunawardana" or "Gunawardana"] and David Seely [hereafter "Mr. Seely" or "Seely"].  The Defendants are the American Veterinary Medical Association [hereafter "AVMA"], and its branches the Educational Commission for Foreign Veterinary Graduates [hereafter "ECFVG"], and the Council on Education [hereafter "COE"].  The Defendants are headquartered in Schaumburg, IL, doing business nationwide.

2.   Jurisdiction is proper under 28 U.S.Code § 1331. Venue is proper under 28 U.S. Code § 1391(b) (3) & (d), as the Defendants do business nationwide and have representatives nationwide; the events in question transpired in several states; and the Plaintiffs have resided in TN, IL and MO during the events in question to the present.

## STATEMENT OF CLAIM

3.   The AVMA holds ultimate decision-making power regarding who can enter the profession of veterinary medicine in the USA, through its monopoly on accreditation of veterinary education programs/institutions and certification of graduates from non-accredited programs/institutions. Per current federal and state regulations, any veterinarian wishing to practice in the USA is required to either graduate from [or attend a specific program in] an AVMA-accredited institution, or obtain certification through the ECFVG program administered by the AVMA. Among other things, this gatekeeping power granted to them by the federal government and state regulatory boards makes the AVMA a state actor.

4.   Dr. Gunawardana, a foreign veterinary graduate, went through the ECFVG program.  During this process she suffered adverse actions, barring her from entering the US workforce in the veterinary field. Said adverse actions were a direct result of discriminatory policies and procedures on the Defendants' part. Foreign veterinary graduates are held to a much higher standard than their professional counterparts including US veterinary graduates and both foreign and US medical graduates, thus violating their equal protections under the constitution. As a result, the percentage of foreign veterinarians practicing in the US is much smaller than that of foreign physicians or other health professionals.   In addition, some of the said adverse actions were committed specifically against Dr. Gunawardana, in violation of AVMA's stated procedures.

5.   Evidence suggests that the AVMA has abused their gatekeeping power with the express purpose of limiting the market for profit, in conspiracy with other organizations as described later. Their policies and practices place restrictions on several groups including foreign graduates,

minorities, and graduates from traditional veterinary colleges. Being part of all aforementioned groups, Dr. Gunawardana was adversely affected as a professional, through unfair denial of her entry into veterinary practice. AVMA's accreditation practices discriminate against graduates from traditional academic model veterinary colleges in favor of the vocational/distributive model veterinary colleges, resulting in market restriction, increased prices and an overall decline in the quality of veterinary services.

6. David Seely is Dr. Gunawardana's husband, witness and assistant throughout her career and the events in question. In addition to indirect damages through his wife, Mr. Seely suffered direct, concrete and particularized harm through the Defendants' actions, including violation of his disability rights. Defendants' policies and practices adversely affected Mr. Seely as a patient and consumer, through increased cost of veterinary and medical services, and through lack of access to services from a diverse group of qualified professionals.

7. Defendants' actions violate several statutes including the Sherman Antitrust Act; Contract laws; the Civil Rights Act of 1964; 14th Amendment of the US Constitution; 42 U.S.C. § 1981; 42 U.S.C. § 1985(3); and the Americans with Disabilities Act [ADA] including its amendments.

## FACTS AND BACKGROUND

8. Subhadra Gunawardana, a US citizen, was born in Sri Lanka and received her professional degree in Veterinary Medicine [BVSc] from the University of Peradeniya in 1991. In 1992 Dr. Gunawardana came to the USA as a graduate student. She completed a MS in Physiology at Iowa State University College of Veterinary Medicine, a PhD in Pharmacology at Cornell University

College of Veterinary Medicine, and postdoctoral research in Diabetes & Endocrinology at Vanderbilt University Medical School. <u>Her academic performance has been excellent, with First Class Honors in the professional veterinary program in Sri Lanka, and a grade point average of 4.0 throughout her graduate studies in the USA.</u> She is currently employed as an Associate Professor at Washington University Medical School, St Louis, MO.

9.    The AVMA is an organization representing veterinarians, and is recognized as the collective voice for the entire veterinary profession. AVMA collects dues from veterinarians in exchange for protecting, promoting, and advancing the veterinary profession. AVMA secures federal grant funding and loan repayment relief for veterinarians, and its political action committee provides financial support to selected candidates seeking election to the U.S. Congress. As AVMA has stated: "*The AVMA is the nation's leading advocate for the veterinary profession. Representing more than 95,000 members, we protect, promote and advance the needs of all veterinarians and those they serve." "We develop positions on key issues and advocate for veterinarians, advancing their ability to provide crucial veterinary services. We provide educational accreditation and certification programs that protect and elevate the quality of veterinary care." "The AVMA represents the interests of veterinarians through strategically targeted advocacy in Congress, with regulatory agencies, and before the courts. At the state level, we work as trusted partners to complement the advocacy work of state veterinary medical associations.*"

10.  The COE and ECFVG are the branches of the AVMA that carry out the stated function of providing educational accreditation and certification programs. Under the policies and procedures set up by the AVMA, the ECFVG tests the professional skills of foreign veterinary graduates

seeking to practice in the USA, and provides the educational certification necessary for that purpose. AVMA is the sole authority recognized by the federal government for accreditation of veterinary education programs, and ECFVG certification is an educational pre-requisite for foreign veterinary graduates as accepted by the federal government and all state regulatory boards.

11. ECFVG certification includes 4 steps: Credentials verification; English language testing; written exam; and the Clinical Proficiency Exam which includes seven sections of hands-on practical skills testing.

12. If a candidate receives an adverse decision at any point in the program, they have the opportunity to appeal through the ECFVG/COE internal appeals process. The candidate can first submit a petition for reconsideration through the ECFVG, and if not satisfied with that decision, a subsequent petition for review which is conducted by the COE. Once these two internal appeals are exhausted, candidates have no further recourse.

13. In September 2009 Dr. Gunawardana started the process of qualifying for license to practice Veterinary Medicine in the US.  US licensing regulations required her to first obtain the ECFVG certification administered by the AVMA. From 2010 through 2013 she completed the first three steps of the ECFVG program, which include Credentials verification, English language testing, and Basic and Clinical Sciences Examination [written exam]. From 2015 through 2017 she went through the final step, the Clinical Proficiency Exam [CPE].

14.  <u>In her first attempt in September 2015, Gunawardana passed 4 out of the 7 sections in the</u> <u>CPE. She re-took the 3 failed sections in October 2016. A week before the scheduled retake,</u> <u>Gunawardana developed painful osteoarthritis in her right hand, making it difficult perform the</u> <u>many manual tasks required at the CPE. She requested an accommodation from the AVMA. The</u> <u>request was denied as untimely, without further investigation. She did the section retakes with no</u> <u>accommodation, passed two sections and failed one. The reason for said failure was the lack of</u> <u>accommodation, as described in detail in Count VII. AVMA policy did not allow her to appeal</u> <u>this failing grade, as the denial of accommodation did not violate AVMA's stated procedures.</u>

15.  <u>Dr. Gunawardana re-took the remaining section, Anesthesia, in November 2017.  She received</u> <u>a failing grade, which she is certain to be erroneous.</u> She appealed this decision through the ECFVG appeals procedure. The appeal was denied at both levels, leaving no further recourse. As described in detail in <u>paragraphs 16-21</u>, the appeal was handled improperly. The complaint is not only about this specific decision but the appeals procedure itself and ECFVG policies as a whole, which violate the equal rights of its candidates. The denial of her appeal is a direct result of the problems with these policies.

16.  As reason for failure in the CPE anesthesia section in 2017, the score report alleges a fatal flaw, i.e. *"Candidate failed to secure endotracheal tube and inflate the cuff appropriately within the time allotted after induction of anesthesia"*.  Plaintiff is certain such a flaw did not happen, and appealed the decision with detailed evidence [Exhibit 1: Appeal correspondence]. Even though ECFVG failed to provide any independent impartial evidence to support the score report, both

review panels upheld the original adverse decision, breaching <u>the fundamental fairness standard and the substantial evidence rule.</u>

17.  Plaintiff disputes the examiner's position, and strongly believes that the videotape of this exam section would uphold her position and show that she performed <u>all required</u> tasks correctly and in time [Exhibit 1, pages 1-2].  ECFVG refused to release this videotape [Exhibit 1, page 8]; failed to address many specific points raised in her petition, and denied the petition without providing a valid reason [Exhibit 1, page 4: Decision letter dated 02/07/2018].

18.  Subsequently she submitted a petition for review, pointing out the aforementioned facts and providing additional evidence demonstrating her ability to perform the tasks in question well within the time limit [Exhibit 1, pages 7-9: Petition for Review, submitted 03/01/2018]. While the COE review panel acknowledges the evidence presented, they affirm the original adverse decision based solely on the disputed score report with no independent verification, once again failing to address/rebut the key points Plaintiff presented [Exhibit 1, pages 10-13: Memorandum dated 04/20/2018, Decision letter dated 05/18/2018].

19.  <u>Recently discovered evidence show that a)The examiner did not follow the manual of administration [MOA] when administering the anesthesia exam in question, thereby violating AVMA's stated procedures; b)The ECFVG went to great lengths to conceal this situation from Gunawardana, including misrepresenting key facts in her score report and repeatedly refusing to release her exam material; c)The appeal review panels were aware of said actions of the examiner and the ECFVG when they chose to uphold the failing grade.</u>

20.  The actions of both review panels fail to meet the substantial evidence standard, falling short of the fundamental fairness, transparency and rules of evidence customary in arbitration procedures and the industry standards in equivalent programs such as USMLE/ECFMG [United States Medical Licensing Examination/ Educational Commission for Foreign Medical Graduates], not to mention ECFVG's own stated procedures of considering evidence presented.


21.  The aforementioned situation is not an isolated incident, but rather a routine occurrence with all/most appeals from CPE candidates, as would be evident from ECFVG's records. This is due to the flaws in the appeals process and the policies overall. In particular, the appeals process is designed in such a way that candidates cannot prevail. Recently discovered evidence confirms this allegation, showing that the AVMA repeatedly and consistently denies CPE candidate appeals using form letters, without addressing the specific points presented by candidates.


22.  On 09/05/2018 Dr. Gunawardana wrote to Dr. John de Jong, then president of the AVMA, describing the problems with the system, requesting correction of said problems and requesting specific relief for her situation [Exhibit 2, pages 1-2]. Dr. de Jong replied stating that he would forward her email to the ECFVG and request that they review their policies and procedures in light of her comments and provide a response to him [Exhibit 2, page 3]. Dr. de Jong further stated that as president of the AVMA he had no role in the reviewing or modifying decisions by the ECFVG, and these concerns should be addressed back to ECFVG staff.  Accordingly, Dr. Gunawardana wrote to ECFVG staff again, requesting to reverse the adverse decision in light of the problems with the appeals procedure specified in her letter to the president [Exhibit 2, page 4]. ECFVG

responded on 9/25/2018, refusing the request per their current policies, and failing to acknowledge the specific problems with the current policies pointed out by Gunawardana [Exhibit 2, page 5].

23.  Subsequently Dr. Gunawardana submitted complaints to several federal regulatory agencies including the EEOC, USDE, USDoJ Education Opportunities Section and Disability Rights Section. The EEOC issued a Right to Sue letter on November 07, 2018.  The remaining agencies declined to investigate, citing a lack of jurisdiction or referring it to another agency. Thus, it appears that the AVMA/ECFVG/COE operate with no oversight or regulation, which in itself is a violation of the equal rights and protections of the candidates that they serve.

24.  The ECFVG policies and procedures, including the appeals procedure, breach a number of laws and guidelines such as the Sherman Antitrust Act; Contract laws; the Civil Rights Act of 1964; the Equal Protection and Due Process Clauses of the 14th Amendment; 42 U.S.C. § 1981; 42 U.S.C. § 1985(3); Americans with Disabilities Act and its amendments; and the Code of Professional Responsibilities in Educational Measurement. By imposing a greater burden on foreign veterinary graduates, these policies violate their equal rights.

ECFVG policies & Procedures

*a. Appeals procedure [Exhibit 3, pages 15-19]:*

25.  The grounds for appeal are limited, and do not allow appeal in the event an examiner made an honest mistake or a biased decision; or in the event a stated procedure of ECFVG is incorrect.

26. When a candidate disputes an examiner's assessment on a specific matter, the appeals procedure should have an independent and unbiased method to verify whose position is correct. ECFVG does not have such a process in place, in contrast to equivalent professional programs such as the ECFMG/USMLE. Not having an impartial verification process, ECFVG appeals committees base their decisions solely on the examiners' records, i.e. the very items under dispute in the first place. This procedural flaw is evident in the handling of the Plaintiff's appeal, where she disputed a single entry in her score report. Plaintiff's position can be easily proven/disproven by a videotape of her anesthesia exam section. ECFVG first declined to release this videotape [Ex.1, page 8: email dated 12/20/2017]. Then in response to her petition for review, ECFVG stated that there is no videotape. Either way, they have provided no impartial evidence to support their position, and the COE review panel's decision falls short of the substantial evidence standard.

27. ECFVG prohibits candidates from obtaining any evidence from their own exam, leaving candidates with no way to prove their position in appeal. In response to Gunawardana's appeal, the review panel states: *"ECFVG policy allows, but does not require, video recording of the examination, and thus the lack of video documentation does not constitute failure to follow stated procedures. Furthermore, video recordings, if performed, cannot be used to reverse failing scores."* If candidates cannot obtain or use videotape evidence of their exam sections, a factual dispute on the events during an exam can never be resolved in an impartial manner. Appeals will be automatically decided against the candidate simply due to purported "lack of evidence", thus making the appeals procedure one-sided and redundant. This is a significant flaw in the stated procedures. Such procedures are unconscionable, and adverse decisions made under these procedures should be null and void.

10

28.   Having deprived candidates of the most critical evidence, the appeals process also disregards any other evidence a candidate presents in support of their claim. In Gunawardana's case, the review panel has stated "*The CPE is based on the anesthesia skills demonstrated during the examination, not based on the past or what may happen in the future*" thus disregarding the additional evidence she presented demonstrating her ability to perform these tasks in time. Considering that professional skills need to be ongoing and permanent, this statement is incorrect, and contradicts the AVMA Principles of veterinary medical ethics.

29.   The lack of transparency occurs in all steps of the appeals process. While candidates are required to send all documentation to ECFVG, candidates do not get to see any statements made or evidence presented by the ECFVG. The review panel members for both steps of the appeal are selected by the ECFVG/COE/AVMA at their sole discretion, with no input from candidates.

30.   Candidates may request a hearing, but are required to bear all expenses including travel and lodging for all participants.  Hearings have no standard procedural guidelines, and candidates are not allowed legal representation. The review panels are not required to consider all evidence presented, or to show reasons for their decisions. Candidates have no further recourse once the two steps of internal appeal are exhausted.

31. The aforementioned policies violate the Administrative Procedures Act [APA]. If AVMA/ECFVG/COE are not subject to the APA or equivalent statutes, that in itself deprives ECFVG candidates of their right to equal protection and due process, considering that the federal government and state regulatory boards have given these organizations absolute decision-making

power over a specific group of people in a profession with far-reaching impact on the welfare of patients and clients.

32.  The aforementioned restrictions strongly contrast with the exams and appeal procedures for other equivalent professionals, such as US veterinary graduates or both foreign and US medical graduates. For example, the clinical exams in the USMLE are routinely videotaped; Dispute resolution processes are transparent; and candidates have opportunity for external appeal and legal representation.

*b. English Language Requirement [Exhibit 3, page 10]*

33.  A waiver is available only for candidates from a few countries. All other foreign candidates have to pay for the English language test, even if they had completed their education in English; had passed the same English test over two years earlier; and/or can provide ample proof of English proficiency in other ways.

34.  It is noteworthy that the USMLE, a lengthy and stringent examination consisting of many written sections and many patient encounters, does not require prior demonstration of English proficiency.

35.  In addition to the appeals procedure, there are general problems with the CPE administration and the contract as a whole. The following are just a few examples.

*c. CPE Candidate Bulletin [Exhibit 4]*

36. ADA non-compliance: While the CPE candidate bulletin allows disability accommodation requests, it mandates the requests be made 90 days or more prior to exam date, thus excluding all disabilities that may occur within 90 days of the exam. [Exhibit 4, page 6: CPE testing accommodations]. Plaintiff was denied an accommodation request in October 2016, resulting in failure of her previous Anesthesia section. This incident is described separately in Exhibit 5.

37. CPE format [Exhibit 4, page 2; Exhibit 3, page 12]: The CPE involves testing of hands-on skills of all aspects of veterinary medicine, including surgery, anesthesia, and clinical medicine in several different species. While Plaintiffs have no objection to this, it is noteworthy that such requirements are not made from US veterinary graduates, foreign medical graduates in the US, or foreign veterinary graduates in other countries like the UK. All these groups have gone through rigorous clinical training during their professional education, and only foreign veterinary graduates seeking to practice in the US are required to re-demonstrate all clinical/surgical skills. This requirement in itself places foreign veterinary graduates in an unequal position to their US counterparts, a situation exacerbated by the exorbitant fees and flawed appeal process associated with the ECFVG program.

38. Subjective nature: CPE sections are scored based solely on the examiners' evaluations, which are subject to human error. Lacking independent verification, this allows unfair treatment of candidates through mistake, incompetence or active bias on the examiners' part, not to mention compromising patient welfare.

39.  Excessive burden on candidates: If a candidate fails any single section three times, they have to repeat all 7 sections of the whole exam [Exhibit 4, page 5: CPE retakes]. Having to repeat sections in which one has already demonstrated proficiency is unfair in several ways. It is a substantial burden on time and resources, considering the exam cost of $7200-$7600 plus travel and lodging. Due to the subjective nature of scoring, candidates may fail one or more sections they had passed before, forcing them to retake the full exam many times. [Such incidents would be evident in the ECFVG records, and online forums have personal accounts of such incidents.]

40.  Not only are the ECFVG exam fees much greater than those for equivalent medical exams [Exhibit 4, page 3: Fees for the Full CPE], but they are non-refundable even in cases of family or medical emergencies [Exhibit 4, page 6: Application Process for retaking CPE sections; Rescheduling a Full CPE or retake sections], and increase each year. This policy imposes a particular burden on foreign veterinary graduates from developing countries.

41.  Notably: Foreign medical graduates who wish to practice in the US get to take the exact same exam alongside US medical graduates [the USMLE], where they are tested for both written and clinical skills in a transparent manner, <u>with ADA compliance and flexible rescheduling policies.</u> In contrast, foreign veterinary graduates are subjected to a number of *additional* exams not required of US veterinary graduates; conducted in a non-transparent manner; *without* access to a fair and unbiased appeal process; and <u>without full ADA compliance or access to rescheduling even in case of medical or family emergency.</u>

42.  The aforementioned policies and practices reduce competition in the veterinary profession in an unethical manner, by imposing excessive restrictions on foreign graduates and making it difficult for them to enter the US workforce. The most obvious evidence for this is the far lower percentage of foreign veterinarians employed in the US compared to that of foreign physicians.

43.  Inequalities in the system become further evident by the key differences between the medical and veterinary licensure pathways, and the organizations who provide them. Since US veterinary graduates are not required to take the additional practical exams required of foreign veterinary graduates, the only way to demonstrate these inequalities is a comparison with the closest equivalent profession, human medicine.

Comparison of Medical and Veterinary Fields

44.  Licensure in each professional field requires passing of a national licensing examination. Applicants eligible to take such exam are either graduates from accredited institutions, or graduates from non-accredited institutions who are certified by the appropriate educational commission.

45.  In the medical licensing process, each function is performed by a separate entity:

- Examination: USMLE, owned and operated by the Federation of State Medical Boards (FSMB) and the National Board of Medical Examiners (NBME)

- Accreditation: LCME, Liaison Committee on Medical Education, sponsored by the Association of American Medical Colleges and the American Medical Association

- Certification: ECFMG, Educational Commission for Foreign Medical Graduates

46.  These are separate distinct entities with separate distinct responsibilities. Graduates from both LCME accredited and non-accredited institutions take the same national licensing exam with the same testing standards, USMLE.  Graduates from non-accredited institutions are first verified and approved through the ECFMG, which merely involves credential verification and other paperwork regarding examinations. There is no separate exam administered by the ECFMG.  [See https://www.usmle.org/apply/index.html]

47.  The equivalent functions in the veterinary licensing process are:

- Examination: North American Veterinary Licensing Examination (NAVLE), administered by the International Council for Veterinary Assessment (ICVA)

- Accreditation: COE, branch of the AVMA

- Certification: ECVFG, branch of the AVMA; Program for the Assessment of Veterinary Education Equivalence (PAVE), administered by American Association of Veterinary State Boards (AAVSB)

48.  Similar to the medical licensing process, NAVLE is a pre-requisite for all applicants who wish to practice in the US, whether they graduated from an AVMA accredited or non-accredited institution. *Unlike* the medical licensing process, graduates from non-accredited institutions are subjected to a number of additional requirements besides the NAVLE. In contrast to ECFMG which mainly involves credentials verification, ECFVG certification is a 4-step program including credentials verification; English language testing, a written exam of basic and clinical skills; and a clinical proficiency exam comprised of seven sections of hands-on practical skills testing. In

16

other words, unlike their counterparts, foreign veterinary graduates are required to repeat all their

final exams before they are eligible to apply for licensure.

49.   A limited number of state veterinary boards accept the "PAVE" program in lieu of ECFVG

certification. PAVE also has 4 steps: credentials verification, English language testing, a written

exam, and the final step of Evaluated Clinical Examination [ECE]. ECE involves enrollment in

the final year clinical rotations in an *AVMA accredited institution*, paying out-of-state tuition, and

taking and passing the clinical evaluations at that institution. Thus, the PAVE is still controlled by

the AVMA, is more expensive and time-consuming than the ECFVG certification, and is not

accepted by a number of states including Missouri.

50.   Regardless of which path to certification they choose, foreign veterinary graduates have to go

through the AVMA one way or another. Furthermore, such certification requires the extra step of

repeating the clinical exams they already passed in their home institution, a requirement not made

of foreign medical graduates, US medical graduates or US veterinary graduates.

51.    In contrast, ECFMG does not subject foreign medical graduates to any extra exams.  Neither

do the ECFMG or AMA accredit foreign institutions/programs [which AVMA/COE routinely do,

in exchange for huge fees]. ECFMG relies on accreditation processes within the candidates'

country of origin. ECFMG does not have an English test requirement either. Considering that US

licensing exams are conducted in English, anyone without fluency would take them at their own

risk, and an additional English requirement, as in ECFVG, is redundant.

52. Unlike the medical program where the examination, accreditation and certification are performed by separate and distinct entities, in the veterinary program all functions are performed or controlled by AVMA.

53. Unlike most companies or non- profits, the AVMA has members in virtually every state and province in North America, and in every institute, board, company and association concerned with veterinary medicine. For example: Linda Scorse, DVM, is on the Missouri Veterinary Licensing Board, and is the Missouri delegate to the House of Delegates, the policy-making arm of AVMA. The director of AAVSB Vito DelVento, DVM, was concurrently a member of AVMA American Board of Veterinary Specialties of Washington, D.C., as well as a staff member on the D.C. licensing board.  In other words, many voting members of the AVMA are also decision-makers in other influential entities. So much co-inhabiting makes for numerous conflicts of interest and ethics violations.

54. The medical licensing program has taken active steps to avoid such conflicts and violations. They are all separate entities with no co-inhabiting with each other or the government. Their procedures are transparent and comply with the APA.

55. In summary, it appears that the medical profession strives to acquire the best picks from the world, while the veterinary profession engages in protectionism. Thus ECVFG/CPE testing itself is redundant. The mere existence of ECFVG/CPE exam process, without transparency, oversight, or compliance with accepted standards, is a violation of equal protections.

## CLAIMS FOR SUBHADRA GUNAWARDANA

### Count I: Contract Claims

56.  Defendants' policies violate both the Common Law Doctrine of Unconscionability, and ILCS 5/2-302.  In addition, recently discovered evidence show specific actions that violate AVMA's own stated procedures, constituting Breach of Contract.

57.  ECFVG engages in a contract with each candidate for a service in exchange for money, to evaluate their professional knowledge and skills for a certificate making them eligible to apply for US licensure. The contract is created by ECFVG under the oversight of the AVMA. This contract is one-sided and unfair; lacks transparency and oversight; consequently making it impossible for the majority of candidates to pass. This fact is evident by the high fail rate in the ECFVG program, particularly when compared with USMLE pass/fail rates for foreign medical graduates.

58.  The contract is unconscionable due to the following reasons.

• All documents associated with the contract [including but not limited to: program enrollment; registration for each step; candidate bulletin etc.] specify numerous duties and obligations for candidates but few or none for the ECFVG/AVMA.

• The contract contains a mandatory exculpatory clause that provides blanket exoneration to the ECFVG/AVMA under any and all circumstances.

• There are no requirements for the ECFVG/AVMA to act in a fair and transparent manner.

• There is no external oversight of the CPE exam process to ensure that examiners and staff act fairly towards candidates [or humanely towards patients].

- The Appeals procedure is not fair or transparent, is entirely one sided, and is designed in such a way that candidates cannot prevail. [¶¶ 25-32]

- All aforementioned factors make for gross inequality of bargaining power.

59. Dr. Gunawardana paid the AVMA with the expectation that the ECFVG program would assess her skills in a fair and unbiased manner, which constituted an offer and acceptance [Exhibit 6]. AVMA failed to meet the implied covenant of good faith and fair dealing.

60. Intent of unequal bargaining power is further evidenced by the mere existence of the waiver, which exonerates the AVMA from any and all claims arising from or related to the certification process, thus allowing the AVMA/ECFVG to perform any act of negligence or injustice without consequence. Foreign graduates who wish to practice in the US have no choice but to sign this waiver, making it an adhesion contract. These circumstances conflict with public policy, and the waiver should not be enforceable.

61. The contract encompasses a number of services [credentials verification, English language testing, written exam, practical exam, evaluation of each step, and appeals for each step when applicable] that ultimately lead to the ECFVG certificate, which is a "good" under the UCC. The unconscionability of this contract is actionable under common law for the services, and ILCS 5/2-302 for the certificate.

62. Confidential documents produced by Defendant after the filing of the First Amended Complaint demonstrate that the AVMA breached their own written policies and procedures.

Specifically, they show that the failing grade in question is non-compliant with the CPE Examiner Training and the 2017 Anesthesia MOA, both Candidates' and Examiners' versions [Exhibits 7 and 8]; and that ECFVG officials took intentional steps to uphold the failing grade and conceal critical facts from Gunawardana on several occasions.

63. As stated repeatedly in CPE Master MOA and Examiner Training, CPE examiners are required to follow the specific instructions in the current year's MOA; A candidate's score should not vary based on where the CPE is taken nor who the evaluator is; and examiners should refrain from expecting or requiring descriptions or actions beyond the standard rubrics in the MOA.

64. In the 2017 CPE anesthesia section, Gunawardana received a "fatal flaw" for allegedly not completing the tasks of induction and intubation within the 5-minute period as specified in the MOA. The examiner's handwritten notes [Exhibit 9] state: "Fatal flaw. candidate did not secure endotracheal tube w/in the 5 min limit. Did not check cuff pressure before she ran out of time". First, Gunawardana completed all *required* tasks including securing the endotracheal tube well within the time limit, as consistently stated in her appeals to the AVMA. More importantly, "checking cuff pressure" is *a task the MOA does not list for the 5-minute limit*. [Exhibits 7,8]. Thus, the examiner had acted outside the authority of the MOA, in violation of both the master MOA and the Examiner Training. The examiner's notes show several other errors as well.

65. The score report ECFVG had previously provided to Gunawardana [Exhibit 10] does not match the examiner's notes on the fatal flaw, stating instead "candidate failed to inflate the cuff appropriately within the time allotted", a task required within the 5 minute limit per the MOA.

Thus, ECFVG officials intentionally wrote the score report to match the MOA instead of the examiner's notes.

66.  Dr. Gunawardana appealed the failing grade, and requested her exam documents to help prove her position. Defendant repeatedly denied her requests, citing "policy" [Exhibit 1, page 8].  To the best of Plaintiffs' knowledge, AVMA's written policies do *not* prohibit candidates from receiving their own exam materials. Additionally, Defendants' answers to Plaintiffs' Requests for Admission #35&36 state that their policies do allow ECFVG candidates to receive their own exam materials. During discovery Defendant repeatedly withheld production and moved for protective orders for the same documents. Thus, since the failing grade in question, Defendant has made numerous attempts to withhold Gunawardana's exam materials from her, in violation of their own written policies.

67. Defendants' internal emails [Exhibit 11] show that the ECFVG Appeals Subcommittee members were well aware of the discrepancy between the MOA and the examiner's decision; they chose to uphold the failing grade despite the discrepancy; and planned to modify the MOA. The Subcommittee's decision directly contradicts CPE Examiner Training material, which repeatedly instructs examiners to adhere to the scoring rubrics of the master MOA.

68. From the moment they became aware that the examiner had made several errors and acted outside the MOA, ECFVG had several opportunities to correct the situation and do the right thing. They could have canceled that section and offered Gunawardana a free retake either on their own accord, or in response to her appeals.  Instead they chose to change the score report and deny the

appeals, and continued to actively hide the discrepancies throughout their subsequent actions. These are intentional acts of deception, which prove the ECFVG to be untrustworthy. Any offer for free retake now does not redress the damage done, since the AVMA cannot be trusted to conduct any exam in a fair manner or not to retaliate against Plaintiff.

69. Dr. Gunawardana is amply qualified to practice veterinary medicine, as indicated by her veterinary licensure from Sri Lanka, excellent academic record throughout her professional and graduate education [including two AVMA-accredited traditional veterinary colleges], and successful completion of 6 out of 7 sections of the CPE according to AVMA's own criteria. The only realistic way to redress the damage is to award the ECFVG certificate she would have received but for the unethical actions of the AVMA.

70. The documents show another instance of breach of contract, albeit less critical: Step 1 of the ECFVG program is credentials verification, which should be complete upon verification of candidate's graduation by the foreign veterinary institution. During Gunawardana's application, she was told by the ECVFG that her verification was not complete, and was repeatedly asked to produce proof of graduation again until January 2013. Documents received in discovery show that ECFVG had already requested and received proof of her graduation from the University of Peradeniya in October 2009.

71. Thus, AVMA committed at least 5 actions breaching their own contract.

23

Count II: Violation of Title VII of the Civil Rights Act

72.  Dr. Gunawardana, a foreign veterinarian originally from Sri Lanka, is part of a protected class due to national origin under Title VII of the Civil Rights Act.  Plaintiff's Title VII claims arise from AVMA's actions of barring her entry into the profession in their capacity as a labor organization and an employment agency.

73.  The AVMA is an employment agency under Title VII because they are the gatekeeper for all veterinary graduates seeking employment in the US, and maintains a career center which functions as a liaison between potential employers and employees. Said career center helps match potential employees with employers, and provides job-seeker assistance through tools such as career coaching, resume writing, reference checking, and career learning presentations.

74.  The AVMA is a labor organization under Title VII.  AVMA's principle stated function is professional advocacy. According to their own definition: "*The AVMA is the nation's leading advocate for the veterinary profession. Representing more than 95,000 members, we protect, promote and advance the needs of all veterinarians and those they serve.*"  As the "Collective voice for the veterinary profession", AVMA purports to protect, promote and advance the needs of *all* veterinarians. AVMA's Core values state: "We represent and support a diverse community of veterinarians with unique perspectives." As stated in their diversity statement: "The AVMA is committed to diversity and inclusion in all aspects of the profession of veterinary medicine". Thus, the AVMA has an implied duty to Dr. Gunawardana to protect her professional interests.

75. AVMA's additional functions of accreditation and certification which involve actively limiting the workforce directly conflict with their major mission of professional advocacy for all veterinarians. Notably, other professions have taken active steps to eliminate such conflicts.

76. Furthermore, ECFVG certification process is intentionally discriminatory towards the very population it serves. Compared to equivalent professional programs, ECFVG is exorbitantly and unnecessarily expensive; subjects its candidates to burdens not placed on their US counterparts; is not transparent; lacks mechanisms for fair and unbiased arbitration during disputes; and lacks regulation and oversight. It appears that the ECFVG policies were crafted with the intent to minimize the entry of specific groups into the veterinary profession, as is evident from the high fail rates in the ECFVG program [25% first time pass rate in the CPE compared to foreign medical graduates' 90% first time pass rate in the USMLE final step]. As a result, the percentage of foreign veterinarians in the US is very low compared with the percentages of foreign nationals in other professions.

77. Results of such discriminatory policies are evident in the disparate impact on the profession. Even with liberal calculation, foreign veterinarians comprise of less than 5.5% of the US veterinary profession compared with over 25% foreign physicians in the US medical profession. According to the AVMA there are 120,652 veterinarians in the US as of 2018 [Exhibit 12]. "*In 2018, more than 154 ECFVG certificates will be awarded to graduates of more than 75 different veterinary schools in approximately 40 different countries. Since the inception of the current certification program (January 1, 1973) through December 31, 2018, the ECFVG has awarded more than 6,535 certificates.*" [Ex.13], averaging 145 per year. This is a mere fraction of the total number of veterinarians who have practiced between 1973 and 2018, and a very small percentage compared

with that of foreign medical graduates practicing in the US. "*There are more than 247,000 doctors with medical degrees from foreign countries practicing in the United States, making up slightly more than one-quarter of all doctors*." [Exhibit 14; American Immigration Council report].

78. Considering that in many traditional foreign universities, veterinary colleges share faculty and classes with their medical counterparts [as did the institution Dr. Gunawardana attended], it is rather odd that foreign veterinary graduates seem to perform so poorly here in the US compared to their medical counterparts. It is also odd that, unlike with medical graduates, detailed statistics on foreign veterinary graduates' performance in US licensing/certification exams are not made available to the public by the AVMA.

79. Such discriminatory conduct towards a specific group of professionals violates AVMA's own stated mission of "*protecting, promoting and advancing the needs of all veterinarians*". Importantly, it violates title VII of the Civil Rights Act. In addition to such discrimination etched in AVMA's policies and practices, recently discovered evidence shows direct discriminatory actions taken against Gunawardana, which violate AVMA's own stated procedures. [¶¶ 62-71]

80. Plaintiff followed all requirements under Title VII, including exhausting her administrative remedies. The AVMA received the Right to Sue letter from the EEOC in November 2018, and Plaintiff provided a copy of the same letter in response to Defendants' first motion to dismiss. A copy is attached here as well. [Exhibit 15]

26

Count III: Violation of 42 U.S.C. § 1981

81. Dr. Gunawardana, a US citizen originally from Sri Lanka, is part of a protected class due to race under 42 U.S.C. § 1981.

82. Defendants' practices involve race discrimination that goes above and beyond the national origin discrimination etched AVMA's written policies. Evidence of such race discrimination is in the ECFVG enrollment application that requires candidates to disclose specific information on their ethnicity and appearance, including color, height, weight, native language, and their citizenship at different stages of life. Further evidence of such discrimination is in the disparate impact on the profession, as indicated by the 6.8% non-white veterinarians in the US, the smallest representation in any professional field.

83. 93.2% of US veterinarians are white as of 2016 [Exhibit 16]. While the ECFVG policies are generally discriminatory to all its candidates, adverse actions seem to be directed particularly at non-white candidates. Even though there are several AVMA-accredited foreign universities from predominantly non-white countries [Mexico, Korea and the West Indies], this is not reflected in the population of practicing veterinarians in the US. Thus, AVMA's practices disfavor the entry of non-white races into the US workforce.

84. Recently discovered evidence shows specific discrimination aimed at Gunawardana that not only goes above and beyond AVMA's written policies, but also violates ECFVG stated procedures such as the MOA [¶¶62-71]. Since the group of AVMA officials who committed discrimination had no prior relationship with Gunawardana, singling her out strongly suggests a racial motivation.

85. For foreign veterinary graduates, ECFVG certification is a direct prerequisite to US licensure. Unfair denial of said certificate prevents Gunawardana from receiving her license to practice in the US, which is the most important contract in this profession. Defendants' actions prevent Plaintiff from entering numerous other contracts, including any employment contract as a licensed veterinarian in the US, certain positions which accept the ECFVG certification in place of licensure, and enrolling in educational/training programs limited to ECFVG certificate holders or licensed veterinarians in the US.

86. Defendants also prevented Plaintiff from enforcing the contract that existed between her and the ECFVG. They first breached this contract by granting and upholding the erroneous failing grade in violation of their own stated procedures. Plaintiff attempted to enforce the contract through the ECFVG appeal process. Defendant prevented her from enforcing the contract first by withholding evidence [once again in violation of stated procedures], then by denying her appeals without a fair and unbiased evaluation.

Count IV: Violations of the 14th Amendment of the Constitution

87. Section 1 of the 14th amendment to the US Constitution states in part: "*No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States*; *nor shall any State deprive any person of life, liberty, or property, without due process of law*; *nor deny to any person within its jurisdiction the equal protection of the laws.*"

88. AVMA's functions and its relationship with the federal and state governments make it a quasi-governmental entity, and there are many instances courts have recognized private associations and

institutions as state actors. The performance of a public function, a function that has been traditionally and exclusively performed by the state, is state action. *Marsh v. Alabama, 326 U.S. 501 (1946).* If the government coerces, influences, or encourages the performance of an act, it is state action. *Rendell-Baker v. Kohn, 457 U.S. 830 (1982).* A private organization can be considered a state actor if there is sufficient entwinement between the state and the organization. *Brentwood Academy v. Tennessee Secondary School Athletic Association, 535 U.S. 971 (2002).*

89. The AVMA is a state actor subject to the 14th amendment because: All state regulatory boards require applicants to complete AVMA-accredited or AVMA-administered programs as a prerequisite for state veterinary licensure. The United States Department of Education [USDE] recognizes the AVMA COE as the sole accrediting authority for veterinary education, and tapped them for additional responsibilities previously held by a USDE subcommittee. AVMA is a gatekeeper for Title IV and Title VII federal funding, and administers/distributes federal grants. AVMA officials are pervasively intertwined with state agencies including regulatory boards, federal departments and the military.

90. Importantly, the ECFVG was created at the request of the state boards. As AVMA states: "*The AVMA's Educational Commission for Foreign Veterinary Graduates (ECFVG) certification program was formed at the request of state regulatory boards. So, the purpose of the ECFVG is to assist state veterinary regulatory boards in identifying and certifying graduates of foreign, non-accredited veterinary schools who have attained an education comparable to that of graduates of accredited schools. This certification fulfills the education prerequisite to be eligible for licensure.*" Thus, state governments have clearly influenced, encouraged, and/or coerced not only the performance but the very existence of the ECFVG, making them a state actor beyond doubt.

91.  AVMA's policies treated Dr. Gunawardana unequally to her other professional counterparts including domestic veterinary graduates and both foreign and domestic medical graduates. ECFVG policies place a much greater burden on foreign veterinary graduates from non-accredited institutions by subjecting them to an additional set of exams not required of their professional counterparts; at a huge financial cost; with no transparency, oversight or regulation; and without adequate disability accommodations. Such unequal treatment is tantamount to the segregation practices in the Jim Crow era.

92.   In addition, AVMA COE's recent accreditation practices that contradict their own written policies result in unequal treatment and discrimination against graduates from traditional academic model veterinary colleges in favor of graduates from vocational/distributive model veterinary colleges, as described under Count V.

93.  As stated in the AVMA website: "The ECFVG certification program is accepted by all state veterinary regulatory boards and the federal government as meeting, either in part or full, the educational prerequisite for licensure or certain types of employment, respectively."  State licensing boards *require* either ECFVG certification or completion of an AVMA-accredited veterinary education program for all veterinarians applying for licensure. No veterinarian can receive a US license without first going through the AVMA. This gate-keeping power delegated to the AVMA collectively by all state boards makes the AVMA a state actor.

94. In the 1950's, the USDE named the COE the nation's sole programmatic accreditor of domestic veterinary education. In 2015, The USDE asked the COE to accredit foreign veterinary

education programs, a function previously performed by a USDE subcommittee. "Programmatic accreditors provide schools, including foreign programs that cater to U.S. citizens, the ability to offer students access to professional loans under Title VII of the U.S. Public Health Act."…"USDE *tapped* the COE for a bigger role — ensuring that foreign veterinary schools are qualified to participate in Title IV federal student aid, which includes programs such as Pell Grants, Direct Loans and Perkins Loans. The COE's new authority began July 1, per *federal regulations that ordered USDE to find an accrediting body* to do the job previously held by the National Committee on Foreign Medical Education and Accreditation (NCFMEA)." … "Now that the COE is a gatekeeper for Title VII *and* Title IV eligibility, U.S. veterinary accreditation is even more attractive.*"* [Exhibit 17]. Importantly, "accreditation by AVMA-COE is a *required* element in enabling the programs the agency accredits to establish eligibility to participate in non-HEA *federal* programs." Additionally, AVMA "prioritizes some programs administered by the U.S. Departments of Agriculture (USDA) and Health and Human Services (HHS) as "active pursuit of passage" and other programs as "support" passage during the congressional appropriations process" for them or their members. *See AVMA Fiscal Appropriations.* The aforementioned are further instances of the government influencing the acts.

95.  AVMA members serve as board members on state regulatory boards across the country, and are affiliated with the military, the USDE and other government agencies, while retaining their voting rights in the AVMA. They receive government funds directly or indirectly, and make decisions on allocating government funds. Further, the COE is a gatekeeper for title VII and title IV federal funding. Such entwinement with state entities, and its role in receiving and distributing government funds, makes the AVMA a state actor.

31

96. Thus, the AVMA's functions of accreditation, certification, and administration of federal funds represent the exercise of a right or privilege created by the state or by a rule of conduct imposed by the state, making it a state actor.  <u>Importantly, the ECFVG was created at the request of the state boards.</u>

97. <u>Veterinary licensure, the document conveying the right to practice veterinary medicine, is widely accepted to be a property interest. The ECFVG certificate which is a pre-requisite for such licensure is a property interest in the same principle.  Furthermore, ECFVG certification alone qualifies foreign veterinarians for certain types of employment so it has economic value independent of the license.</u>

98. Dr. Gunawardana holds a license to practice in Sri Lanka, and therefore a property interest. Years of education, experience, service and income under her original licensure should convey her a legitimate entitlement to licensure here in the US, or at least a fair, transparent and straightforward path towards it.  The AVMA deprived her of the US veterinary licensure to which she is entitled.  They have not proven she is unqualified, in violation of their obligations as a state actor. Such obligations include due process, equal protection, transparency and following the APA.

99. "The Board has the power ultimately to protect the public from unqualified practitioners, but its exclusions, whether based on statute or the Board's own judgment, must be rationally related to that objective.  Since that is not the case here, I would conclude that the absolute bar imposed by the Board pursuant to the statute and regulation violates Dr. Linton's right to equal protection." *Linton v. Missouri Veterinary Medical Board., 988 S.W.2d 513 (Mo.banc 1999).* The Plaintiff in

*Linton* had not received her veterinary licensure at the time, and the Court found an *applicant's* right to equal protection was violated when she was treated differently from other applicants. Dr. Gunawardana is an applicant, already licensed in another country.

100. Any graduate in the health professions seeking US licensure has a property interest, as in the right to make a living using the skills they acquired through many years of education and training. Any governmental entity/entities that regulate such professions have an obligation to provide fair treatment and equal protections to all such individuals through all steps of the process, such as application, evaluation, licensure, review, recertification etc. including appeals regarding any of these steps.

101. Veterinary graduates from non-accredited institutions are systematically deprived of their right to due process throughout the evaluation process by the AVMA. In addition to subjecting them to a number of additional exams not required of their domestic counterparts, AVMA policies violate procedural due process through the numerous deficiencies in its exam and appeals processes. These include but are not limited to: lack of transparency; lack of proper disability accommodations and rescheduling options, no access to an external appeal forum outside the AVMA; prohibition of obtaining relevant evidence, and not being allowed legal representation.

102. In summary, ECVFG/COE/AVMA policies result in unequal treatment of all foreign veterinary graduates as opposed to US veterinary graduates and both foreign and US medical graduates. These are the doctors that treat you and your family; the veterinarians that treat your pets and farm animals. Why is there a more stringent onus on foreign veterinary graduates than

anyone else in the health professions? All Plaintiffs request is the same treatment received by other equivalent professionals. Lack thereof is a clear violation of the 14th amendment.

Count V: Violations of the Sherman Antitrust Act

103. 15 U.S.C. §1 states: *Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.*

104. 15 U.S.C. § 2 states: *Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.*

105. AVMA is the sole authority on accrediting veterinary education institutions/programs in the US. By deciding at their sole discretion, which programs/institutions are accredited and which graduates from non-accredited institutions are certified, the AVMA effectively controls who can enter the market. Anyone who wishes to practice veterinary medicine in the USA must go through

the AVMA one way or another [¶¶ 44-50].Thus, AVMA has created and maintains a monopoly in the field of veterinary medicine in the United States, in direct violation of 15 U.S.C. § 2.

106.Said monopoly is endorsed by state regulatory boards [at whose behest the ECFVG was created], and by the USDE [who tapped the AVMA to accredit veterinary education institutions/programs]. Said monopoly is not regulated. While AVMA's accreditation program has nominal oversight from the USDE, their certification program has no oversight at all.

107.In the recent years the AVMA has abused their monopoly power, to restrict the market solely for profit. They act in conspiracy with the Banfield Hospital and several vocational/distributive model veterinary schools, in violation of 15 U.S.C. § 1.  By flooding the market with graduates from distributive model schools, they place active restrictions against specific groups including foreigners, minorities and graduates from traditional research-model institutions. Another part of the conspiracy appears to be between the AVMA and the state boards, to restrict the entry of foreign veterinarians into the market.

108.Such market manipulation has been widely discussed in the profession. An article in JAVMA [Journal of the American Veterinarian Medical Association] July 1, 2014 by Malinda Larkin states: *Antitrust caution clashes with workforce concerns: "When talk of the veterinary job market has arisen, some have said the AVMA should take action to limit the number of veterinary graduates. Or that the AVMA Council on Education should no longer accredit foreign veterinary schools as a result of perceived workforce issues associated with students graduating from these institutions who come to the U.S. to practice… Most recently, Dr. Robert R. Marshak, dean emeritus of the University of Pennsylvania School of Veterinary Medicine, sent a letter this spring to state VMAs*

*asking them to support him in his efforts to persuade the Department of Education's National Advisory Committee for Institutional Quality and Integrity to recommend that the USDE withhold recognition of the COE as the accrediting body for veterinary medicine until reforms are made to its composition—not mentioning the fact that most of these reforms had already taken place (see JAVMA, Sept. 1, 2013). In the letter, Dr. Marshak wrote as one of his arguments against the COE: "This proliferation of accredited vocational and foreign schools, and the increase in student numbers to make up for severe cut backs in funding for our traditional state supported schools, are adding significantly to the number of new graduates, many marginally trained, at a time when there is already a surplus of veterinarians and the applicant pool as a whole appears to be diminishing. ... The negative financial impact of the growing workforce surplus on private veterinary practices, especially in an economy that may take decades to recover, cannot be overestimated."* [Exhibit 18] While these reforms that "had already taken place" are not specified, it is interesting that the ECFVG program imposes stricter and stricter standards on its candidates each year, while significantly relaxing COE's standards for accreditation.

109. "*In 2012 the Department of Education National Advisory Committee on Institutional Quality and Integrity (NACIQI) demanded significant changes in how the COE operates. The USDE received over 800 complaints and staff summarized the negative comments this way:*

• *Non-acceptance of current COE standards and processes, with accusations that standards are vague, inconsistently enforced and weakened to justify the accreditation of substandard schools.*

• *The commingling of the AVMA and AAVMC and allegations that these groups' close oversight of the COE breeds conflicts of interest. The COE acts at the whim of AVMA leaders*

*whose interests might conflict with the good of the profession and public.*

• *The profession's progress as a science-based medical profession is compromised due to the accreditation of substandard schools that lack robust research programs and the inadequate training of graduates.*

• *The decision to accredit foreign veterinary schools was made unjustly by the AVMA Executive Board and not the COE. The decision is strongly opposed by many in the veterinary community."* [Exhibit 19]

110. As described in detail by Dr. Marshak and others [Exhibit 20], AVMA COE has recently accredited a number of vocational model veterinary schools, some of which did not meet COE's own criteria for accreditation. As a result, the US veterinary market is flooded with veterinarians with sub-standard training and little interest in promoting science and research, leading to a decrease in the overall quality of the veterinary profession while increasing prices for clients. This is evident from comments from practitioners in the field, including first-hand accounts provided in COE listening sessions such as the one in February 2015.

111. Many such vocational schools have received massive financial support from the Banfield hospital system, the largest veterinary hospital chain in the US, owned by Mars Inc.  In the recent years Banfield hospitals have proliferated throughout the US, and they have purchased several independent veterinary hospital chains, squeezing out traditional veterinary practices. Graduates from the vocational model schools are provided incentives for employment in the Banfield system, which, according to clients' accounts, charges inflated prices and prescribes numerous unnecessary services. The AVMA also receives monetary contributions from Banfield.

112. To make room for the influx of graduates from vocational schools, AVMA uses its decision-making power to restrict the market against groups such as foreigners, minorities, and graduates from traditional schools [as evidenced by the population statistics in the field; the ever-increasing restrictions placed on ECFVG candidates over the past decade, and the loosening of COE's own standards for the express purpose of accrediting certain non-traditional vocational schools]. Being part of all three groups, Dr. Gunawardana was adversely affected as a professional. Mr. Seely was adversely affected as a patient and a consumer of services in the market, through increased prices and lack of access to services from a diverse group of qualified professionals.

113. Dr. Gunawardana is amply qualified to practice veterinary medicine, as indicated by her veterinary licensure from Sri Lanka, excellent academic record throughout her professional and graduate education, and her productive career in medical research. She was barred from the profession solely due to the unethical actions of the AVMA, in an anti-competitive manner. Thus, injuries to Gunawardana include loss of the earnings she would have made in the veterinary profession from the time of unfair denial of the certificate until potential age of retirement. Such earnings range from a minimum of $975000 [15 years of entry level salary without benefits, raises, or bonuses] to over $3 million [25 years of salary including benefits, raises and bonuses].

114. Importantly, injuries resulting from such market restriction is not limited to the Plaintiffs. Injuries include a tangible decline in the quality of the veterinary profession, as described by some practitioners who have experienced this problem first-hand; Increased prices for clients in exchange for poorer quality service for patients; A "pushing out" of traditional veterinary practices; and a marked decrease in employment opportunities for graduates from traditional

model veterinary schools.   "The purpose of the Sherman Act is to protect consumers from injury that results from diminished competition. *Banks v. NCAA, 977 F.2d 1081, 1087 (7th Cir.1992).* Thus, the plaintiff must allege, not only an injury to himself, but an injury to the market as well." *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984)." *Agnew v. Nat'l Collegiate Athletic Ass'n, 683 F.3d 328, 335 (7th Cir. 2012).* By engaging in economic protectionism, the Defendant has caused unmeasurable damage to consumers, to science, and to any industry associated with veterinary medicine such as research, medicine, animal husbandry etc. In addition to the Plaintiffs' rights, the Defendants' actions have damaged the public, animals, and the field in general.

<br>

Count VI: Violation of 42 U.S.C. § 1985(3)

115.42 U.S.C. § 1985(3) prohibits conspiracies designed to deprive a person of equal protection of law. "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Farber v. City of Paterson,* 440 F.3d 131, 134 (3d Cir. 2006) (quoting *United Bhd. of Carpenters & Joiners v. Scott,* 463 U.S. 825, 828-29 (1983).

<br>

116.The AVMA is unlike the typical corporation. Over 80% of US veterinarians are AVMA members [compared to under 20% of physicians being AMA members], resulting in widespread influence throughout the profession and beyond.  AVMA members participate in and control the market, some voting and serving on AVMA's boards and House of Delegates while being active

market participants; AVMA members are also on state veterinary regulatory boards across the country, affiliated with various government agencies, and the military. Those who administer the PAVE and NAVLE are also in the AVMA, who receives government funds directly or indirectly, and makes decisions on allocating government funds. Considering such excessive intertwining with other agencies leading to obvious conflicts of interest, the AVMA should not be shielded by the intracorporate conspiracy doctrine.

117.42 U.S.C. § 1985(3) refers to a conspiracy by *"two or more persons…. of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws…."* Considering that the AVMA's membership is widespread; that they perform many different functions; and have affiliations with many organizations including state and federal entities, a conspiracy within AVMA members, within its committees, and/or between AVMA and outside entities, is more than plausible. Evidence of such a conspiracy is outlined in detail under Count V. <u>It is between the AVMA, the Banfield Hospitals, and several distributive model veterinary schools with the purpose of market domination by the Banfield system. Another part of said conspiracy appears to be between the AVMA and the state boards, to restrict the entry of foreign veterinarians into the market.</u>

118. *"The purpose of depriving a class of persons of equal protection of the laws or of equal privileges and immunities under the laws"* is evident in AVMA's policies and procedures which place a greater burden on foreign graduates. Enforcement of these discriminatory policies, as the AVMA has been doing for decades, constitute acting in furtherance of the conspiracy. This is evidenced by the population statistics in the veterinary field [Exhibit 16]; the ever-increasing

restrictions placed on the ECFVG candidates over the past decade, and the loosening of COE's own standards for the express purpose of accrediting certain non-traditional vocational schools. Plaintiffs' injuries were a direct result of said policies.


### Count VII: Violations of the Americans with Disabilities Act

119. In October 2016 Dr. Gunawardana was denied an accommodation request by the ECFVG, resulting in failure of her previous Anesthesia section. This incident is described in Exhibit 5.


120. Briefly: Gunawardana was scheduled to retake three CPE sections at WVC, Las Vegas, Nevada in October 17-19, 2016. Following sudden debilitating pain in her right hand and wrist, on 10/10/2016 Gunawardana was diagnosed with osteoarthritis of the 1st carpometacarpal joint. Any activity with this hand would cause a flare-up of pain, and could potentially compromise her performance at the exam. On 10/11/2016 she emailed the testing coodinator and requested an accommodation, describing the situation and attaching the medical report. The request was denied, per the AVMA policy that all accommodation requests should be received at least 90 days prior to the exam date. Due to lack of accommodation, Gunawardana was in severe pain by the time she started the last section of the exam, Anesthesia. Due to the pain she could not complete a specific task in time, and received a failing grade for that section. Immediately after the exam she wrote to the site and exam administrators explaining this situation, and received no relief. [Exhibit 5].

121. AVMA's policies require accommodation requests be submitted at least 90 days before the scheduled exam, excluding any disability/accident that may occur within 90 days, or a worsening of health in an already disabled person. Importantly, candidates are not allowed to reschedule without forfeiting all exam fees even in the event of medical or family emergency [Ex. 4, page 6].

These policies violate the ADA, and contrast with those of the USMLE where candidates can always reschedule exams, either at no charge or for a small fee depending on timing. Had the AVMA allowed flexible rescheduling, Gunawardana could have taken the exam later when her pain was controlled. Alternatively, had the AVMA provided her the requested accommodations, she would not have been in such pain during the anesthesia section in 2016, and would have been able to successfully complete it.

122. According to the Act the one requesting accommodation has: *a physical or mental impairment that substantially limits one or more major life activities, or has a record of such an impairment, or is regarded as having such impairment.* Plaintiff has an ongoing medical record of arthritis that limits the function of her right hand, first diagnosed in October 2016. She submitted a detailed description with a medical record showing the diagnosis. AVMA denied her request without investigation or consideration, because it was made within 90 days from the exam date. As for time, the Act simply states the request must be in a "timely manner". ECFVG's 90-day limit is arbitrary and violates the Act. It excludes any disability/accident that may occur within 90 days, or a worsening of health in an already disabled person. The Act further states that a testing agency or provider offering *"examinations or courses related to applications, licensing, certification, or credentialing for secondary or post-secondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals."* 42 U.S.C. § 12189.

123. This is a continued violation. While Plaintiff's injury started in October 2016, the Defendant's ADA violations are etched in their policies. *"Because the violations Scherr alleges are continuing, the applicable statute of limitations does not bar her claim." Scherr v. Marriott International, Inc.,F.3d,*

*2013 WL 57857 (7th Cir., Jan. 7, 2013).* Since the policies that violate the ADA are still in effect with the ECFVG, Plaintiffs' claim is not time barred.

## CLAIMS FOR DAVID SEELY

124.  Mr. Seely invested all his skills, efforts and resources in his wife's career, for the shared goal of her entering the veterinary profession. When the AVMA barred Dr. Gunawardana from employment, and violated her constitutional rights and the Sherman act, they violated Mr. Seely's in so much as the toll the process took on him.

125. The ECFVG certification procedure, including exam fees, the associated training activities to brush up on clinical skills, and travel and lodging for CPE sections [including the Anesthesia sections that received erroneous failing grades] involved considerable expense. Plaintiffs' financial resources being pooled together, this economic damage affects Mr. Seely just as much as Dr. Gunawardana. Similarly, the future loss of earnings in the veterinary field due to unfair denial of her certification causes equal economic damage to Mr. Seely as to his spouse. *International Ass'n of Firefighters v. City of Ferguson*, 283 F.3d 969 (8th Cir. 2002) "This court held that because of the economic effect on her (a joint bank account and the level of spousal support), she was asserting her own rights and thus had standing. Id. at 973." *Alternate Fuels, Inc. V. Cabanas*, No. 06-3794/07-1462 (8th Cir. Aug 18, 2008).

Count VIII: Violation of the ADA

126.  Defendant admits that their policies prohibit candidates from rescheduling exams without losing all fees, even in case of medical or family emergencies. This policy in itself violates

disability rights of candidates and their family members. AVMA's adverse actions against candidates cause a chilling of the disability rights of their family members.

127.Consequent to AVMA's denial of Dr. Gunawardana's disability accommodation request, Mr. Seely had to accompany her on the trip to Nevada on short notice and do all carrying and lifting for her, to ensure that her hand would be spared for the exam as much as possible. [Gunawardana is certain that Seely's help was instrumental in her passing the first two sections of that exam, Surgery and Equine medicine.]   Seely is disabled himself, and these events caused him considerable pain and stress including extra medical expenses.   Had the AVMA allowed candidates to reschedule without losing all fees, he would not have suffered this inconvenience and damage. Thus, Defendants' policies and actions violated Seely's disability rights as well.

128.While generally spouses or relatives cannot be a party to contractual suits where they are not parties, there are exceptions. "This court held that because of the economic effect on her (a joint bank account and the level of spousal support), she was asserting her own rights and thus had standing. Id. at 973." *International Ass'n of Firefighters v. City of Ferguson,* 283 F.3d 969 (8th Cir. 2002).

## CLAIMS FOR BOTH PLAINTIFFS

### Count IX: Violations of the Sherman Antitrust Act

129. As direct consumers of veterinary services, both plaintiffs were harmed due to AVMA's monopoly in the veterinary field.

130. The AVMA is the gatekeeper with sole authority on who enters the veterinary profession in the US. AVMA also consists of active market players with a personal stake in controlling the numbers entering the market, thus keeping prices high. This practice has damaged both Gunawardana and Seely who have owned and rescued animals from a young age to this day. Lack of access to affordable veterinary care has been a constant problem in poor communities such as the one Seely grew up in. Essential preventive services such as spay/neuter have been [and still are] unaffordable and inaccessible, resulting in the pet overpopulation problem and consequent suffering we still see today. In the 20+ years the plaintiffs have been together, they have rescued many homeless animals, the majority of whom they could not keep due to exorbitant prices in veterinary care. As direct purchasers of companion animal veterinary services, both plaintiffs have suffered, and continue to suffer, economic damages due to antitrust violations by the AVMA. "Because the Plaintiffs were buyers from, and the customers of, Defendants regardless of whether they paid for the drugs through an intermediary, they were participants in the market constrained and, consequently, are well within the outer limits of Minnesota antitrust standing." *In re Lorazepam & Clorazepate Antitrust Litig.,* 202 F.R.D. 12, 21 (D.D.C. 2001)

131. In conspiracy with the Banfield system and several vocational model veterinary schools, the AVMA continues to restrict the market against graduates from both non-accredited institutions and traditional institutions. By denying entry of many qualified professionals into the field and pushing out existing traditional veterinary practices, Defendants cause ongoing harm to Plaintiffs as direct consumers of veterinary services, which are not limited to companion animal veterinary care. As a disabled person suffering from numerous health problems, Mr. Seely is a consumer of many pharmaceuticals and medical technologies, the development of which involves the skills of

veterinary research professionals, and requires lab animal veterinary services. <u>The same problems affect Gunawardana as a general consumer of medical services.</u>  Market control by AVMA hikes up the prices of all these services used by <u>Plaintiffs as patients and consumers, and deprives them</u> of the opportunity to receive services from a wide and diverse group of qualified professionals. "…any person who claims to have been injured by a discriminatory housing practice," shows a congressional intention to define standing as broadly as is permitted by Article III of the Constitution, and petitioners, being tenants of the apartment complex, have standing to sue under § 810(a). Pp. 409 U. S. 208-212." *Trafficante v. Metropolitan Life Ins. Co.* C-70 1754 (N.D. Cal.)

## RELIEF

132. Defendants' actions, policies and procedures have caused damage to public welfare through lack of transparency and oversight in the veterinary profession; restriction of the entry of qualified veterinarians into the profession; and monopoly of the field by a single organization. As described above, the mere existence of the ECFVG program in its current form violates the equal rights of its candidates, and any adverse decisions made under these unconstitutional policies should not be enforceable.

133. <u>Defendants' actions, policies and procedures have caused specific damage to Gunawardana through unfair denial of her entry into the veterinary profession in the US;</u> violation of her civil rights and disability rights; unequal treatment from the time she enrolled in the ECFVG program to date, and ongoing; and unfair drain on time and resources, including impediments to advancement in her current career. <u>Such impediments include but are not limited to: loss of career advancement opportunities she would have received through having an ECFVG certificate, and</u>

loss of productivity and funding opportunities in her current position due to the excessive time she had to spend trying to correct the problems that occurred with the CPE.

134. Dr. Gunawardana is amply qualified to practice veterinary medicine, as indicated by her veterinary licensure from Sri Lanka, her excellent academic record throughout her professional and graduate education, and successful completion of 6 out of 7 sections of the CPE. She was barred from the profession solely through the unethical actions of the AVMA, in a discriminatory and anti-competitive manner. To be made whole, she should receive either the ECFVG certificate, or the earnings she would have made in the veterinary profession from the time of unfair denial of the certificate until potential age of retirement. Such earnings range from a minimum of $975000 [15 years of entry level salary calculated without benefits, raises, or bonuses] to over $3 million [25 years of salary including benefits, bonuses and raises].

135. Defendants' actions have caused damage to Mr. Seely through violation of disability rights, unfair drain on time and resources, increased cost of products and services, and active restriction of access to services by a diverse group of qualified professionals.

136. Wherefore, Plaintiffs respectfully request the Honorable Court to grant the following relief:

   a. Either awarding the ECFVG certificate to Dr. Gunawardana, or, compensatory damages of a minimum of $975,000 for loss of earnings in the veterinary profession.

   b. $30,000 in compensation for the unfair drain on time and resources including impediments to advancement in her current career from November 2017 to date.

   c. Full reform of the ECFVG/COE policies over a reasonable and specified period of time,

in such a way that the equal rights of all veterinary graduates, foreign and domestic, are protected. Such reform is best accomplished by abolishing the ECFVG program altogether, and establishing a single testing mechanism for all veterinarians wishing to practice in the USA, regardless of their country of origin or institution of veterinary education. Such a testing mechanism should be well-regulated, transparent, APA-compliant, and treat all candidates equally. Such a program would be best conducted by an organization not part of or related to the AVMA, and may be modeled after the USMLE.

d. Compensatory damages for Mr. Seely for damage to his health and for violations of the ADA; Reform of the rescheduling policies in the CPE or other equivalent exam, so that candidates do not forfeit exam fees in case of medical and family emergencies; Reform of accommodation policies for candidates and their families to comply with the ADA.

e. Compensatory damages for the antitrust violations against both Plaintiffs.

f. All statutory and punitive damages the Court deems fit.

g. Court costs and attorneys' fees as supported by statute.

h. Any other relief the Court deems fit.

Respectfully submitted,
/s/Dr. Subhadra Gunawardana
/s/David Seely, With Consent
Plaintiffs
4308 Marion Garden Ln
Florissant, MO 63034
314-764-1520; 615-423-8851
subhadra.gunawardana@wustl.edu
david-seely@live.com

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and accurate copy of the foregoing document was

forwarded to all parties by email November 5, 2020.


/s/Dr. Subhadra Gunawardana
/s/David Seely, With Consent

**3:19-cv-96; Proposed document #97: Second Amended Complaint**

Gunawardana, Subhadra <subhadra.gunawardana@wustl.edu>

Thu 11/5/2020 9:01 AM

**To:** ILSDdb_NJRpd <NJRpd@ilsd.uscourts.gov>
**Cc:** Marissa Dellacroce <mdellacroce@grsm.com>; Hayes Ryan <hayesryan@grsm.com>; David Seely <david-seely@live.com>

📎 4 attachments (12 MB)
Second Amended Complaint- Gunawardana et al. v AVMA.docx; Exhibits 1-7.pdf; Exhiibits 8-11 Under Seal.pdf; Exhibits 12-20.pdf;

Your Honor,

We, the plaintiffs in the above-referenced case, hereby request the Court's leave to file our Second Amended Complaint, pursuant to federal rule 15(a) and local rule 15.1.

As instructed in local rule 15.1 and the CM/ECF user's manual, we have filed the motion to amend and attached the proposed document here as a Word file with new material underlined. We are submitting the exhibits in three sets, with one set designated "Under seal".

Respectfully,
Subhadra Gunawardana and David Seely
314-764-1520
615-423-8851